# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. PATRICK WINGATE

**Direct Appeal from the Circuit Court for Bedford County**
**Nos. 14304; 14367, William Charles Lee, Trial Judge**

---

### No. M1999-00624-CCA-R3-CD - Decided May 25, 2000

---

The appellant, Patrick Wingate, appeals his Bedford County convictions for first degree murder and aggravated arson, which resulted in sentences of life plus twenty-five years. On appeal, he argues (1) the evidence is not sufficient to support either conviction and (2) the trial court erred by failing to grant a mistrial based upon the introduction of prior bad acts of the appellant through the testimony of a State's witness. The jury returned verdicts for both premeditated and felony murder. Although we conclude that the evidence is not sufficient to support the jury's verdict that the murder was committed with premeditation, the evidence is sufficient to sustain their verdict for felony murder. Accordingly, finding no error of law requiring reversal, we affirm the judgments of conviction entered by the trial court.

**T.R.A.P. 3(b) Appeal as of Right; Judgment of the Circuit Court affirmed.**

HAYES, J., delivered the opinion of the court, in which SMITH and OGLE, J.J. joined..

Hershell D. Koger, Pulaski, Tennessee, attorney for appellant, Patrick Wingate.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, David H. Findley, Assistant Attorney General, William Michael McCown, District Attorney General, and Roger G. Crigler and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The appellant, Patrick Wingate, was found guilty by a jury of first degree murder and aggravated arson. He was sentenced to life imprisonment for first degree murder and twenty-five years for aggravated arson. In this appeal as of right, the appellant contends:

> I. The evidence at trial was insufficient to support a guilty verdict as to both the homicide and the arson charges; and
> II. The court should have granted a mistrial when State's witness Baker testified that the appellant "had done killed once before;"

After review, we affirm.

## Background

On December 15, 1997, at approximately 3:00 p.m., Wanda Shirley returned to the residence she shared with Steve Pugh on Warners Bridge Road in Bedford County. As she drove up the driveway, she saw smoke coming from the shop behind the residence. When she opened the door to the shop, she only noticed one area of fire. She then quickly moved Pugh's vehicle away from the building and called "911."

At approximately 3:20 p.m., the Bedford County Volunteer Fire Department arrived at the scene of the fire. Charles Matthew Doak, a firefighter with the Volunteer Fire Services in Bedford County, testified that, when the firefighters entered the shop, they discovered what appeared to be a body lying on the floor. EMS was then called to the scene. The only fire in the room was under the victim; the fire was contained to the body and the floor immediately beneath the body. Beneath the body, burned checks and part of a burned checkbook were discovered. The body was located approximately five feet from the door, in the center of the room. The body was identified as that of Steve Pugh.

Dr. Charles Harlan conducted the autopsy. The examination of the victim revealed multiple injuries including four different lacerations or tears of the scalp and head and multiple areas of burn, including 80 percent total body surface area, fourth degree burns. "A fourth degree burn is charring, looks like charcoal." Dr. Harlan explained that "[t]he injuries to the head are the result of blunt force trauma to the head caused by some firm hard object." "It would take considerable force to cause these injuries. . . it would take about the same amount of force to create these injuries as it would for Mark McGuire or Sammy Sousa to hit a baseball home run 500 feet with a baseball bat." Additionally, he opined that ". . . [the victim] was alive during the time of the fire, but that he died —before he could die of burns, from the blunt trauma to the head." Indeed, Dr. Harlan noted that the victim's "blood carbon monoxide [was] 23 percent, which is only halfway to lethal."[1]

Shortly after the discovery of the body, the appellant, Jimmy Baker and Jeff Gibbs were developed as suspects. The appellant, Baker and Gibbs were part-time employees of the victim and had been working for the victim on the date of his murder. Pugh had hired Jimmy Baker to complete various tasks resulting from Pugh's move from the Wheel community in Bedford County to the Warners Bridge Road residence. The move included the "set up" of Pugh's mobile home. The appellant was later added to Pugh's work crew.

---

[1] Dr. Harlan explained that "[a] lethal level of carbon monoxide is normally considered to be 40 percent or greater. . . ."

At trial, the State's principal witness was codefendant Baker.[2]  Baker related that his first assignment on the morning of December 15 was to purchase some "Michelob." After returning with the beer, Pugh, Baker, Gibbs and the appellant drove to the Wheel residence to "get a load of stuff" to take back to the new residence.[3]  The crew continued to work that morning, stopping only to purchase more beer.  At approximately 2:30 pm, the men returned to the Warners Bridge Road residence, where they proceeded to unload the truck.[4]  By this time, "[Pugh] is done got pretty well lit" and he and Jeff Gibbs began to argue over Gibbs' drinking Pugh's beer.  Gibbs retreated to the residence where he was going to get something to eat, while Baker left the shed to get Pugh more beer.  Only the appellant and Pugh remained in the shop.  While Baker was at his car,  the appellant exited the shop and informed Baker that he was ready to leave.  Through the doorway of the shop, Baker observed Pugh lying on the floor.  Baker did not see any fire in the shop at this time.  The appellant retrieved Gibbs from inside the trailer and the three drove to town where Baker cashed some checks.  The three went to Baker's mother-in-law's house to pick up his children and proceeded to Baker's residence in Lakewood.

Later that evening, law enforcement officers contacted Baker's wife and informed her that Steve Pugh was dead and that Baker, Gibbs, and the appellant needed to contact the Sheriff's Department.  Baker contacted Detective Adams, who requested that the men come to the Sheriff's Department.  Before they left Baker's residence, the appellant stated that he wanted to change his clothes, so Baker gave the appellant a pair of Jordache jeans to put on.  On the way to the Sheriff's Department, the appellant confided to Baker that "he hit Steve in the head and he knowed [sic] that was what that was about." At the Sheriff's Department, the three men were advised of their Miranda rights.  Each related that "[the victim] fell off of a stool in the shop and hit his head.[5]  They picked him up and put him back on it, and then they left."  All three men denied any "foul play" and any knowledge of the fire.  At this point, the men were requested to leave their clothing and shoes for the testing of accelerants.  No arrests were made at this time and the three were provided orange jail clothes to wear out of the office.

The following morning, the appellant telephoned Baker requesting that Baker pick him up. The two returned the jail clothes to the Sheriff's Department and went back to Baker's residence.

---

[2]Baker was convicted of first degree murder and aggravated arson.

[3]At approximately noon, Wanda Shirley, while on her way to Lewisburg, observed  Pugh with Jeff Gibbs, the appellant, and Jimmy Baker at Pugh's residence in Wheel.

[4]John Gold, a neighbor of Pugh, followed Pugh's truck that afternoon at approximately 2:30 pm, watching the truck pull up to Pugh's shop.  He observed Pugh, Jimmy Baker and another individual get out of the truck and enter the shop.

[5]At trial, Dr. Harlan testified in reference to this statement that "the lacerations could have resulted from a fall from a seated position from a bar stool onto a wooden floor if the bar stool is located a couple of hundred feet above the floor, otherwise, it would be impossible."

The appellant asked Baker for some lighter fluid, went outside and proceeded to burn a pair of pants. The appellant told Baker that he was burning the pants because they had blood on them. While returning to town, the appellant instructed Baker to turn off the main road. Baker noticed the appellant with a piece of paper bearing Steve Pugh's signature. The appellant "held it up against the window and started writing a check." He wrote two checks, "one in [Baker's] name and one in his name." The appellant then got out of the vehicle and "burned the rest of the checks."

Baker drove to First National Bank where he cashed the check for $2500 written by the appellant; he deposited $500 in his bank account and kept $2000 in cash. The appellant and Baker then proceeded to Four Lane Motors in Shelbyville. At the car lot, Baker purchased a used Ford van from Tom Koons, the owner. The men initially presented Koons with a check for the purchase of the van, however, he rejected the check because it was a two-party check written on Pugh's account. Koons was aware that Pugh had been murdered the previous day. Nonetheless, Koons agreed to sell Jimmy Baker the van when Baker agreed to pay $500 in cash.

Soon after the appellant and Baker left the car lot with the newly purchased van, they were stopped by authorities. Following the arrest of the two men, officers recovered from Baker's person a check written on the deceased's bank account and $792 in cash. Baker, with the assistance of legal counsel, agreed to cooperate with authorities. Jimmy Baker directed authorities to a specific location on Railroad Avenue/Anthony Road where the appellant had discarded the burned checks. The checks were for the account of Steve G. Pugh. Baker then directed officers to his residence/market in Lakewood. Baker showed authorities a spot on the patio where the appellant had burned his jeans.

Special Agent Laura Hodges, a forensic scientist with the Tennessee Bureau of Investigation, completed fire debris analysis on Steve Pugh's boots. The analysis revealed the presence of a petroleum product. However, an analysis of the clothing of the victim did not reveal the presence of any petroleum distillates. The boots of the appellant and Jeff Gibbs tested positive for the presence of a petroleum product. Jim Baker's boots revealed the presence of a product which could not be positively identified or classified due to the deteriorated condition of the sample. The tests were deemed inconclusive. Likewise, the clothing of the appellant revealed the presence of a product which could not be positively identified or classified due to the deteriorated condition of the sample. Jeff Gibbs and Jim Baker's clothing did not reveal the presence of any petroleum distillates.

Detective Robert Filer, Bedford County Sheriff's Department, testified that he sent thirty-eight alleged "forged" checks to the FBI for examination. Diana Harrison, a document examiner with the Federal Bureau of Investigation, examined numerous checks written on Steve Pugh's bank account. She determined that some of the checks did appear to be genuine signatures of Steve Pugh and then there were some which appeared to have characteristics of tracings or simulations in the Steve Pugh signature. Her analysis revealed that ten of the submitted checks were not the genuine signature of Steve Pugh, but were indicative of the signature being traced. Specifically, she identified the following checks as being traced:

-4-

#101, dated 12-12-97, payable to Jimmy Baker for $2500
#826, dated 11-16-97, payable to Patrick Wingate for $100
#876, dated 11-26-97, payable to Jimmy Baker for $2000
#877, dated 11-26-97, payable to Patrick Wingate for $1850
#878, dated 12-1-97, payable to Jimmy Baker for $2500
#879, dated 11-29-97, payable to Patrick Wingate for $250
#880, dated 12-7-97, payable to Patrick Wingate for $200
#885, dated 12-12-97, payable to Patrick Wingate for $100
#886, dated 12-12-97, payable to Jimmy Baker for $100
#888, dated 12-12-97, payable to Patrick Wingate for $500[6]

Based upon this evidence, the jury found the appellant guilty of both first degree murder and aggravated arson.

## I. Sufficiency of the Evidence

The appellant's argument regarding the sufficiency of the convicting evidence is threefold. First, the appellant contends that the majority of the testimony linking the appellant to the death of Steve Pugh was the testimony of co-defendant Jim Baker. The appellant, referring to the numerous inconsistencies and self-serving statements provided by Baker, argues that this testimony is not credible. Secondly, he asserts that because there was no direct evidence introduced at trial, the evidence was insufficient as a matter of law to support the jury's verdict of guilty for the offenses of first degree premeditated murder, felony murder and aggravated arson. Finally, he contends that the court erroneously submitted the charge of felony murder to the jury as there was an insufficient nexus in the proof, beyond a reasonable doubt, between the causation of death and the "perpetration" of the alleged theft. In support of his argument, the appellant asserts that "there was no proof that anything was taken from the decedent on the day of his death."

## A. Appellate Standard of Review

When reviewing the evidence for sufficiency, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Rather, it is this court's duty to affirm the conviction if the evidence viewed in the light most favorable to the State is sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993); Tenn. R. App. P. 13(e). Moreover, once a defendant is convicted, the presumption of innocence is removed and is replaced with the presumption of guilt so that on appeal the convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[6]The checks dated December 12 were not passed until December 16.

Within his challenge, the appellant relies upon what he calls "the seriously questionable credibility of Jimmy Baker" in support of his argument that "there was no 'web of guilt' woven around [the appellant.]" Moreover, he asserts that the overall lack of proof does not support any "other reasonable inference save the guilt of the appellant beyond a reasonable doubt." During the trial, the jury heard the testimony of Baker, which included numerous inconsistencies within his statements, and was left to evaluate the credibility of his testimony. Indeed, on appeal, we presume the jury performed this function as it is not the prerogative of this court to revisit questions of witness credibility. See generally State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

Moreover, although the evidence in this case is circumstantial, circumstantial evidence alone may be sufficient to support a conviction. See State v. Buttry, 756 S.W.2d 718, 821 (Tenn. Crim. App. 1988); State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, if a conviction is based purely on circumstantial proof, the facts and circumstances must be so overwhelming as to exclude any other explanation except for the defendant's guilt. See State v. Black, 815 S.W.2d 166, 175 (Tenn.1991); State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987); Cooper, 736 S.W.2d at 129. "It must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that the [appellant] is the one who committed the crime." Tharpe, 726 S.W.2d at 896. When reviewing circumstantial evidence, this court must remember that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-57 (1958).

In the case sub judice, the evidence points unerringly to the appellant. There is no dispute that the appellant, Jimmy Baker, and Jeff Gibbs were with the victim at his residence immediately preceding the victim's death and the fire. The appellant was alone with the victim in the shop and the last person to be seen with Pugh before he was murdered. The appellant confided to Baker that he had ". . .hit Steve in the head." The medical proof revealed that the victim was alive at the time the fire was started. The appellant changed his clothes before going to the Sheriff's Department. He later burned the pants he was wearing at the time of the murder. Proof placed the appellant in possession of stolen checks of the victim. Numerous checks were written on the victim's account payable to either Jimmy Baker or the appellant and were passed before and after the murder. FBI document testing revealed that the victim's signature was not original and had been traced. The appellant was observed "tracing" the victim's signature. Police also located checks belonging to Steve Pugh on Railroad Avenue which had been burned. Testing of the boots of the three men revealed the presence of gasoline, as did the testing on the boots of the victim. These factors would permit a rational juror to infer beyond a reasonable doubt that the appellant committed the offenses of first degree murder and aggravated arson.[7] *Infra.* See Jackson v. Virginia, 443 U.S. at 317, 99

---

[7]Before this court can sustain a conviction for aggravated arson as charged in the present case, the proof must establish that the defendant, without the consent of all persons having an interest in a structure, damaged said structure by means of fire or explosion and that one or more persons

S.Ct. at 2789; Tenn. R. App. P. 13(e).  See generally Tenn. Code Ann. §§ 39-13-202(a)(1), (2) (1997); 39-14-301 (1997); 39-14-302 (1997).

## B.  First Degree Murder

Before undertaking our review, we note that the jury found the appellant guilty of both premeditated murder and felony murder. Both crimes constitute first degree murder, see Tenn. Code Ann. § 39-13-202(a)(1), (2); State v. Hurley, 876 S.W.2d 57, 58 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S.Ct. 328 (1994), as, they are but alternate means by which the offense may be committed. Hurley, 876 S.W.2d at 58. Indeed, our supreme court has recognized that "[t]he perpetration of a felony, during which a homicide occurs, is the legal equivalent of premeditation, deliberation and malice." Strouth v. State, 999 S.W.2d 759, 768 (Tenn. 1999), petition for cert. filed, (Jan. 5, 2000) (Holder, J., concurring) (citations omitted). In a case involving a single killing where the jury has found the defendant guilty under both theories of first degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. See   Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997); State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998). In the present case, the trial court entered two judgments of conviction noting that the two counts merged with one another. Additionally, we acknowledge that a general verdict of guilty is sustainable if any one count in the indictment is sustained by the proof. See  Tenn. Code Ann. § 40-18-111 (1997). Accordingly, proof of either felony murder or premeditated murder is sufficient to sustain the conviction.

## 1.  Premeditated Murder

Once a homicide is established it is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn.1992). The State, then, has the burden of proving the element of premeditation to elevate the offense to first degree murder. Id. Premeditation necessitates "the exercise of reflection and judgment," requiring a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App.1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Johnny Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declaration by the defendant of his intent to kill; and the making of preparations

___

were present in the structure at the time of the offense. See  Tenn. Code Ann. §§ 39-14-301; 39-14-302.

-7-

before the killing for the purpose of concealing the crime.  State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1536 (1998) (citing Brown, 836 S.W.2d at 541-42). Additional factors from which a jury may infer premeditation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted).

Taken in the light most favorable to the State, the proof established that the victim had hired the appellant to perform odd jobs.  The appellant and Baker were in possession of the victim's checks, had forged the victim's name on the checks, and had obtained funds from the victim's bank account.  On the day of the homicide, the appellant was working at the victim's residence. The victim and the appellant had been drinking throughout the work day.  The appellant was left alone in the shop with the victim.  Thirty minutes later the victim was found dead inside the burning shop. The cause of death was multiple blows to the head.  The victim's checkbook was underneath his body.  The appellant was later observed forging some of the victim's checks and burning other checks of the victim.

After careful consideration of all the facts and circumstances surrounding this homicide, we are unable to conclude that the element of premeditation was established.   The State asserts that premeditation is established by the fact that the appellant had cashed at least five checks on the victim's account (motive), the appellant displayed no emotion upon leaving the scene, and the infliction of multiple blows.  In the instant case, we do not find these circumstances sufficient to establish premeditation.  First, although some of the checks were cashed prior to the murder, there is no evidence that the victim or any other party was aware that the illegal transactions had taken place.  Indeed, the record does indicate that no foul play was suspected regarding the victim's bank account until after the homicide occurred.  Moreover, "[r]epeated blows can be delivered in the heat of passion, with no design or reflection."  Brown, 836 S.W.2d at 542.

While we acknowledge that only a moment of time is required to formulate premeditation, the circumstances surrounding the manner of the killing in the present case do not support, beyond a reasonable doubt, the conclusion that the appellant killed according to a preconceived design. Absent the element of premeditation, the jury's verdict finding the appellant guilty of premeditated murder is unsupported by the proof and  is insufficient to support the appellant's conviction under count one of the indictment.[8]

## 2. Felony Murder

Again, the appellant contends that the court erred by instructing the jury as to the offense of felony murder committed during the perpetration of a theft.  He argues that there is an insufficient

---

[8]Again, in the present case, the jury returned guilty verdicts as to one count of premeditated first degree murder and one count of first degree felony murder.  The trial court properly merged the verdicts into one "judgment of conviction" for first degree murder.  Thus, for appellate purposes there is only one judgment of conviction before this court.

nexus in the proof between the causation of death and the perpetration of the alleged theft.

The appellant was convicted of felony murder in the perpetration of a theft. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (1996 Supp.) (emphasis added).[9] To hold a principal liable under a theory of felony murder, the State must prove more than the commission of a felony followed by an unlawful killing. The prosecution must show a sufficient causal nexus between the felony and the murder to prove that the killing took place as part of the perpetration of the felony. Something more than a mere coincidence of time and place between the wrongful act and the death is necessary. See State v. Farmer, 296 S.W.2d 879, 883 (Tenn. 1956). It must appear that there was such actual legal relation between the killing and the crime committed or attempted that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. See Marshall v. United States, 623 A.2d 551, 560 (D.C. 1992). Within the context of the felony murder rule, the felony and the homicide must be part of a continuous transaction, that the homicide be incident to the felony, or that there be no break in the chain of events between the felony and the homicide. See generally Edwin S. Barbre, Annotation, *What Constitutes Termination of Felony for Purpose of Felony-Murder Rule*, 58 A.L.R.3d 851, 856, 865-874 (1974). The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence. Payne v. State, 406 P.2d 922, 925 (Nev. 1965). In short, whether there is a sufficient causal connection between the felony and the homicide depends on whether the principal's felony dictated his conduct which led to the homicide. Marshall, 623 A.2d at 560 (quoting W. LaFave & A. Scott, Handbook on Criminal Law § 71 at 557).

We acknowledge the appellant's reliance on State v. Terry, 813 S.W.2d 420 (Tenn. 1991). In Terry, the defendant, a church pastor, embezzled substantial sums of money from his congregation over a period of time. Eventually, he killed the church handyman, placed the body inside the church, and torched the building. At the sentencing hearing, the jury found the felony murder aggravating circumstance on the basis of the underlying larceny. The trial court granted the defendant's motion for a new trial, finding that the State had failed to prove that the murder was committed while the defendant was engaged in the perpetration of larceny. The supreme court agreed that there was an insufficient nexus between the murder and the larceny. In so holding, the court stated that application of the felony murder aggravating circumstance depends upon the temporal, spatial, and motivational relationships between the murder and the collateral felony. See State v. Hall, 958 S.W.2d 679, 693 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S.Ct. 2348 (1998) (citing Terry, 813 S.W.2d at 423).

---

[9]The 1995 Amendment to Tenn. Code Ann. § 39-13-202(a)(2), effective July 1, 1995, removed the element of recklessness from the statute.

Again, the appellant, in this case, was convicted of murder in perpetration of theft. See Tenn. Code Ann. § 39-13-202(a)(2). A person commits theft if he "with intent to deprive the owner of property, ... knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (1997). The proof at trial revealed that the appellant was in possession of checks for the bank account of Steve Pugh. He later destroyed some of these checks and attempted to pass others. It was for the jury to determine whether or not the murder of Steve Pugh was committed in perpetration of theft of the checks.[10] Additionally, applying the factors enumerated in Terry to the circumstances of the present case, we find the proof is more than sufficient to establish a sufficient nexus between the underlying felony of theft and the murder of Steve Pugh. The victim of the murder was also the victim of the theft. It can reasonably be inferred from the circumstances that the victim was killed because he could expose the theft, thwart the theft, or interfere with the commission of the theft. See generally Terry, 813 S.W.2d at 424. Finally, by the undisputed evidence of the checks forged prior to and following the murder, the murder was a part of the appellant's continuing scheme to steal checks and ultimately the victim's funds by means of forgery. See Tenn. Code Ann. § 39-14-103. For these reasons, the evidence is more than sufficient to establish that the murder of Steve Pugh was committed during the perpetration of the theft. See Tenn. Code Ann. § 39-13-202(a)(2); Tenn. R. App. P. 13(e). This issue is without merit.

## II. Statement of Baker

On direct examination by the State, Jimmy Baker related that, on the day of Pugh's murder, he left the appellant and Pugh in the shop while he went to his vehicle for more beer. When he was returning to the shop, the appellant met him at the door, stating that he was ready to go. Baker testified that, at this point, he observed Steve Pugh lying on the floor inside the shop. When asked by the prosecutor if he, at this time, was "scared," Baker replied affirmatively, although, he conceded that he did not believe that Steve Pugh was dead. During defense counsel's cross-examination of co-defendant Baker, the following colloquy occurred:

Q:      All right. And I think earlier, when Mr. Crigler, was talking to you, you made the comment at that point that you were scared—

Baker: Yes, sir.

Q:      –right. And I'm assuming that you were scared because you thought there might have been some foul play there of some sort; is that right?

Baker:  Yes, sir, because **he'd done killed one man** and that shook me up.

---

[10]Although the value of the checks is irrelevant in the present case, as the purpose of valuation is limited to grading the offense for sentencing purposes, see Tenn. Code Ann. § 39-14-105 (1997), we acknowledge that the "value" of the stolen checks is "[t]he greatest amount of economic loss that the owner might reasonably suffer by virtue of loss of the document, if the document is other than evidence of a debt." Tenn. Code Ann. § 39-11-106((36)(B)(ii) (1997).

(Emphasis added). Defense counsel requested a side-bar conference and raised an objection to the witness' answer and moved for a mistrial. The court overruled the motion and gave the jury a curative instruction.[11]

In his final issue, the appellant asserts as error the trial court's failure to grant a mistrial "when witness Baker stated to the jury that the Appellant had killed someone before. . . ." The appellant contends that Baker's response to counsel's question was non-responsive and highly prejudicial to the appellant. Additionally, he contends that the trial court's instruction is of little value as "it is essentially impossible to 'unring' the bell."

> In denying the motion for mistrial, the trial court based its ruling on the following reasons: ...this is a matter that is a discretionary call with the court. . . . To reiterate those factors that the Court has taken into consideration . . .is whether or not the allegations are true or believed to be true; in other words, whether the testimony offered is truthful testimony by the witness. And in this case, although it may not be legally true in the sense that there was no conviction, it is obvious . . . that [the witness] believed them to be true.
>
> The next question is whether or not –or the motive behind the testimony that was offered to which the defendant objects. If the motive behind that was to impart to the jury that the defendant is a bad person and, consequently, should be convicted because he is a bad person, then, in the Court's mind, that would be grounds to declare a mistrial.
>
> But in this case, the witness was answering a question posed to him by counsel for the defense. Now, counsel for the defense says, "But I didn't want that answer," or "That wasn't what I'm asking."
>
> Sometimes we fail to realize, as attorneys, that lay persons and lay witnesses are not as sophisticated as we who frame the questions are in their answers. And the answer that the witness responded to was, in part, an answer to the question, and that is an implication that, well, were you scared because there had been foul play?
>
> . . .
>
> A third factor that the Court should consider is the source of the question. Had the State elicited this information, even so, it would have been a close question. But in

_____

[11]The curative instructive provided:
Ladies and gentlemen of the jury, the last response of the witness concerning the defendant having killed another is inaccurate. Even though the witness may truly believe his statement, you are instructed that the statement is not true under the law. You are not to consider whether the statement was true or not.

not requesting a jury-out hearing before the information was elicited, it would have posed a much different question. But here, the defense is responsible for the information being imparted to the jury.

Finally, the Court has to consider whether the probative effect or value is outweighed by the prejudicial effect that it might have upon the jury. And I guess corollary to that is whether that prejudicial effect can be minimized and, if so, how it could be minimized.

. . .[T]he Court still believes, that the State's case against this defendant will rise and fall on this witness. The witness that the State has produced, from the evidence that the jury has heard so far, they will decide which of these two individuals is responsible for the death of Steven Pugh, and it's going to be a question of credibility.
. . .

And given the collateral facts that the jury has heard so far – and counsel has done a very able job of pointing out to the jury that the finger points almost equally.

. . .

Consequently, there is damaging information that are potential issues to this trial that touch upon the credibility of the witness, such that to withhold that information might leave the impression on the jury that the witness is not being truthful, and credibility is the issue, then the probative value of that testimony is extremely high, even though the prejudicial effect may be high.

. . .

Now, the next question is whether or not the prejudicial effect of this information can be minimized with some curative instructions.

. . .

The curative instructions which the Court gave . . . accomplished all of those goals and the prejudicial effect has been minimized.


A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App.1994). The decision to grant a mistrial lies within the sound discretion of the trial court and this court will not interfere

with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998), cert. denied, – U.S. –, 119 S.Ct. 1501 (1999)(citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Initially, we note that the statement complained of was unsolicited by the State, rather, it was elicited by the defense on cross-examination of the State's witness, co-defendant Baker. Moreover, the trial court thoroughly instructed the jury as to why they were not permitted to consider this statement in their deliberations. The jury is presumed to have followed the trial court's curative instructions, absent evidence to the contrary. State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, 516 U.S. 829, 116 S.Ct. 99 (1995); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). With these considerations, we conclude that Baker's statement was not so unduly prejudicial so as to warrant a mistrial. Accordingly, the trial court did not abuse its discretion in denying the appellant's motion for mistrial. This issue is without merit.

Finding no error of law requiring reversal, we affirm the appellant's convictions for first degree murder and aggravated arson.[12] Having found the jury's verdict for premeditated first degree murder insufficient as a matter of law, we remand for entry of a modified judgment reflecting the appellant's conviction for felony murder under count two of the indictment.

---

[12]We acknowledge that the trial court, pursuant to Tenn. Code Ann. § 40-35-201(b)(2)(A)(i) (1997) instructed the jury to "weigh and consider" the minimum number of years the defendant must serve before reaching such person's earliest release eligibility date. This provision was repealed by our legislature effective May 18, 1998. The appellant's trial took place September 1998.